**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

GLORIA QUIMBEY, DECEASED, BY THE PERSONAL REPRESENTATIVE FOR THE WRONGFUL DEATH ESTATE, JOHN FAURE,

Plaintiff,

v. CIV 14-0559 KG/KBM

COMMUNITY HEALTH SYSTEMS PROFESSIONAL SERVICES CORPORATION, LAS CRUCES MEDICAL CENTER, LLC D/B/A MOUNTAIN VIEW REGIONAL MEDICAL CENTER,

and

ACCOUNTABLE HEALTHCARE STAFFING, INC., ACCOUNTABLE HEALTHCARE HOLDINGS CORPORATION, MEDASSETS WORKFORCE SOLUTIONS, RONALD LALONDE,

and

AFFILION, LLC AND DR. JOEL MICHAEL JONES,

Defendants.

# ORDER FOLLOWING HEARING AND IN CAMERA REVIEW

THIS MATTER came before the Court for a hearing on August 31, 2016, on Plaintiff Quimbey's Motion to Compel Discovery from Defendant Las Cruces Medical Center, LLC D/B/A Mountain View Regional Medical Center (*Doc. 169*). Having reviewed the parties' submissions and the relevant law, and having heard arguments of counsel, the Court stated on the record certain rulings and rationale, which it

incorporates herein. Additionally, the Court undertook an *in camera* review of documents, which Defendant Las Cruces Medical Center, LLC ("Defendant Hospital") contends are protected by the New Mexico Review Organization Immunity Act ("ROIA"), N.M. Stat. Ann. § 41-9-1 to 41-9-7 (1978), and the Patient Safety and Quality Improvement Act ("PSQIA"), 42 U.S.C. § 299b-21, *et. seq*. Both of these Acts provide protections against the disclosure of medical peer-review documents and information.

The pertinent provision of New Mexico's ROIA states as follows:

> All data and information acquired by a review organization in the exercise of its duties and functions shall be held in confidence and shall not be disclosed to anyone except to the extent necessary to carry out one or more of the purposes of the review organization or in a judicial appeal from the action of a review organization. . . . Information, documents or records otherwise available from original sources shall not be immune from discovery or use in any civil action merely because they were presented during proceedings of a review organization, nor shall any person who testified before a review organization or who is a member of a review organization be prevented from testifying as to matters within his knowledge, but a witness cannot be asked about opinions formed by him as a result of the review organizations hearings.

N.M. Stat. Ann. § 41-9-5 (1978).

The New Mexico Supreme Court has interpreted ROIA and crafted burdens to govern discovery disputes under the Act. *See Southwest Community Health Services v. Smith*, 755 P.2d 40, 44-45 (N.M. 1988). First, the party seeking to compel discovery, Plaintiff here, has the initial burden of "proving relevance to subject matter." *Chavez* v. *Lovelace Sandia Health System, Inc*., 189 P.3d 711, 715 (N.M. Ct. App. 2008). Next, the party invoking ROIA's protections, here Defendant Hospital, must establish that the data or information was "generated exclusively for peer review and for no other purpose," and that the "opinions were formed exclusively as a result of peer review deliberations." *Id*. Finally, if the court determines that the information is confidential

under ROIA, the party seeking the information must satisfy the court that the information "constitutes evidence which is critical to the cause of action or defense." *Id*. at 715-16. For instance, if the court determines that the "litigant's cause of action or defense would likely turn on the evidence adjudged to fall within the scope of Section 41-9-5, then [it] shall compel production." *Id.* at 716.

In 2005, Congress enacted the PSQIA, which is essentially a federal overlay to state peer-review statutes like ROIA. According to Congress, the PSQIA was drafted to "strike[] the appropriate balance between plaintiff rights and creat[e] a new culture in the health care industry that provides incentives to identify and learn from errors." S. Rep. No. 108-196, at 3 (2003). The PSQIA created a voluntary reporting mechanism for healthcare providers to share data on adverse medical incidents in an effort to improve to patient safety. *See* 24 U.S.C. § 299b-21-26 (2012). The Act grants privileges and confidentiality protections to information that constitutes "patient safety work product." *Id*. Patient safety work product is information that is reported to a patient safety organization (PSO), developed by a PSO, or analyzed as part of a system for reporting to or by a PSO. 42 U.S.C. § 299b-21 (2012). PSOs must be certified and listed by the Secretary of the Department of Health and Human Services. 42 U.S.C. § 299b-24 (2012). The Secretary has delegated this function to the Agency for Healthcare Research and Quality, which maintains an online listing of approved PSOs. 42 C.F.R. § 3.112 (2012).

Plaintiff insists that state law alone, here ROIA, supplies any peer-review privilege in this diversity case, noting that no New Mexico case has recognized the PSQIA as a valid privilege. *Doc. 204* at 9. Unfortunately, there is a dearth of case law

interpreting the PSQIA and its protections. Moreover, the interplay between the PSQIA and state peer-review statutes is far from straightforward. *Compare Teasdale v. Marin General Hospital*, 138 F.R.D. 691, 694 (N.D. Cal. 1991) (determining that a similar prior statute – the Health Care Quality Improvement Act of 1986 – did not preempt state-law discovery of peer-review material) *and Tibbs v. Bunnell*, 448 S.W.3d 796, 809 (Ky. 2014) (reasoning that incident information was not entitled to protection under the PSQIA because it was collected and maintained by the State as part of its regulatory oversight) *with Southern Baptist Hosp. of Florida, Inc. v. Charles*, 178 So. 3d 102, 108-09 (Fla. Dist. Ct. App. 2015) (concluding, in a state medical malpractice case, that the PSQIA preempted a Florida Constitutional provision, rendering documents privileged and confidential under the PSQIA).

Pursuant to the Supremacy Clause of the Constitution, federal laws "shall be the Supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Accordingly, the United States Supreme Court has long held that "state laws that conflict with federal law are 'without effect.'" *See Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008). The Court has also reasoned that preemption may be either express or implied, identifying two types of implied preemption: field preemption, where federal regulation is so persuasive that it suggests that Congress left no room for supplementation by the states, and conflict preemption, where it would be impossible to comply with both federal and state regulations or where the state law is an obstacle to the purpose and objective of the federal law. *See Gade v. Nat'l Solid Wastes Mgmt Assoc.,* 505 U.S. 88, 98 (1992).

In the Court's view, the express language of the PSQIA demonstrates Congressional intent to preempt state peer-review statutes, at least to the extent that a state statute fails to protect information qualifying as patient safety work product. The Act provides that "[n]otwithstanding any other provision of Federal, State, or local law[,] . . . patient safety work product shall be privileged." *See* 42 U.S.C. § 299b-22(a). It goes on to provide that patient safety work product is not subject to disclosure in discovery in connection with a Federal, State, or local civil, criminal, or administrative proceedings. *Id.* Thus, the PSQIA preempts ROIA if ROIA would permit discovery of documents that qualify as patient safety work product. *See Southern Baptist Hospital*, 178 So. 3d at 110 (reasoning that the PSQIA expressly preempted broad discovery rights under Amendment 7 to Florida's Constitution to documents that met the definition of patient safety work product).

ROIA is also impliedly preempted by the PSQIA in circumstances where compliance with both Acts would be impossible. That is, when a court or parties conclude that certain information should be produced under a ROIA criticality analysis, because of implied conflict preemption, the information remains categorically protected and excluded from production so long as it qualifies as patient safety work product under the PSQIA. In short, a court must decline to order production of patient safety work product under ROIA if it would contravene the PSQIA.

Plaintiff's second PSQIA-specific contention is that Defendant Hospital has failed to demonstrate that the information at issue was reported to a PSO as defined in the PSQIA. *Doc. 204* at 9. While the Court agrees that Defendant Hospital devoted inadequate attention to this issue in its brief, counsel for Defendant Hospital did

maintain at the motions hearing that some of the withheld documents were in fact patient safety work product that was submitted to a PSO. Significantly, certain documents reviewed by the Court in its *in camera* review bear the following stamp: "CHS PSO, LLC Confidential patient safety work product document." As explained by Plaintiff in her reply brief, there are 82 PSOs that have been established pursuant to the PSQIA. *Doc. 204* at 10 (referencing https://pso.ahrq.gov/listed). CHS PSO is among those PSOs certified by the Secretary of the Department Health and Human Services. *See* https://pso.ahrq.gov/listed (last accessed October 13, 2016). Thus, provided that the subject documents were created as patient safety work product for CHS PSO, the PSQIA protects those documents from discovery notwithstanding any contrary treatment under ROIA.

**A. Medication Variance Occurrence Logs**

Plaintiff seeks a document entitled "Medication Variance Occurrence Log" for a period of December 1, 2011 to December 30, 2012. She asserts that Defendant Hospital has not shown, as she insists ROIA requires, that the data underlying the Medication Variance Log is not "otherwise available from an original source." *Doc. 204* at 4. Further, she argues that Defendant Hospital's own policies establish that the log was not generated "exclusively for peer review," but that it was also generated for assessing exposure to potential loss, preventing future incidents, improving patient safety, as well as for risk management functions. *Id*. Finally, she insists that the document is critical to her case. *Id.* at 7.

Even if the Court was inclined to order the production of the log under a ROIA criticality analysis, it is constrained from doing so by the PSQIA. Given that each page

of the log is designated as a "CHS PSO, LLC Confidential patient safety work product document," the Court is satisfied – in the absence of evidence to the contrary – that the documents are indeed patient safety work product provided to a PSO. The information contained in the log is precisely the type of information the Court would expect Defendant Hospital to gather and produce to a PSO. Although a definitive statement by affiant Karen Dawson that the information was patient safety work product maintained in a patient safety evaluation system and provided to a PSO would be preferable, the Court is nevertheless satisfied that this log falls within the ambit of the PSQIA. Accordingly, the PSQIA preempts those provisions of the ROIA which would require production of the document. Unlike ROIA, the PSQIA contains no exception for documents that are "otherwise available from an original source" or that are critical to the plaintiff's case. For these reasons, the Court will deny Plaintiff's motion as to the Medical Variance Occurrence Log, which is Bates-labeled 000001-000034.

**B. Incident /Accident Reports**

Next, Plaintiff seeks incident and accident reports, some of which relate to the issue of inadequate informed consent but none of which directly involve the subject incident. These documents, like the Medication Variance Occurrence Log, bear the "CHS PSO, LLC Confidential patient safety work product document" stamp. Likewise, the Court finds these documents to be of the type it would expect the Defendant Hospital to gather for production to a PSO. *See Southern Baptist Hosp.*, 178 So.3d at 106-108 (reasoning that occurrence reports of events inconsistent with routine patient care or that could result in an injury qualified as patient safety work product entitled to protection under the PSQIA). As such, the withheld incident and accident reports are

protected from discovery under the PSQIA. The Court will deny Plaintiff's motion with respect to the Incident/Accident Reports, which are Bates-labeled 000035-000042, 000161-000162.

**C. Stroke Committee Meeting Minutes**

The bulk of the *in camera* documents reviewed by the Court were either Stroke Committee Meeting Minutes or Stroke Committee Meeting Agendas. Defendant Hospital does not specifically contend that these minutes or agendas qualify as patient safety work product provided to a PSO; nor do they bear a stamp identifying them as such. According the affidavit of Karen Dawson, however, the Stroke Committee and the documents and opinions generated therein are among those that deserve protection under ROIA. *See Doc. 193*, Ex. C, at ¶ 8. Ms. Dawson states that the minutes and agendas "were generated exclusively to carry out one or more of the purposes of peer review committees and/or review organizations and for no other reason." *Id.* She goes on to explain that the "opinions and decisions contained therein were formed exclusively as a result of the peer review committee and/or review organizations' deliberations." *Id*. Plaintiff having failed to counter these positions by Ms. Dawson with respect to the minutes and agendas,[1] the Court finds that Defendant Hospital has met its burden to establish that the documents were generated exclusively for peer review and for no other purpose.

However, Plaintiff identifies the minutes and agendas as documents that "likely contain information critical to Plaintiff's cause of action," *Doc. 204* at 8, which requires the Court to undertake a criticality analysis. Having conducted a meticulous

[1] In the context of the Stroke Committee Minutes and Agendas, Plaintiff does not contend that the documents were "otherwise available from original sources."

examination of the contents of the minutes and agendas, the Court cannot say that they contain evidence critical to Plaintiff's cause of action. That is, it is unlikely that the merits of Plaintiff's case would turn on any information contained within these minutes and agendas. Accordingly, the Court will deny Plaintiff's motion with respect to the minutes and agendas Bates-labeled 000043-000136 and 000164-000173.

**D. Stroke Data Spreadsheet and Compilations**

Defendant has identified the following documents in its privilege log which Plaintiff characterizes as "Stroke Data Spreadsheets and Compilations": Stroke Data Spreadsheet 2012, Primary Stroke Certification Data Review, Core Measures Stroke Data Compilation for Quarters 1 through 4, and Core Stroke Data Spreadsheet. Generally speaking, these documents contain statistical information and graphs regarding stroke patients' treatment while at Defendant Hospital's facility. None of the documents are identified as patient safety work product provided to a PSO. Thus, any privilege from disclosure must be a product of ROIA, rather than PSQIA, protection.

First, with respect to the Core Measures Stroke Data Compilation 2012, Plaintiff insists that this data was required to be collected and submitted to the Joint Commission in order to receive and/or maintain certification as a Primary Stroke Center. In support, she attaches directives from the Joint Commission, indicating that the Core Measures data is "required for Primary Stroke Center Certification and or Comprehensive Stroke Center Certification." *Doc. 204*, Ex. 3. The documents themselves corroborate Plaintiff's position, as they indicate that the information therein

was in fact submitted to the Joint Commission as well as CMS.[2] Defense counsel attempted to clarify at the motions hearing that the documents themselves were not submitted to the Joint Commission, but that instead, statistical information was entered into online databases or templates accessible by the Joint Commission. Even so, the Court must consider whether these documents constitute "data and information acquired by a review organization in the exercise of its duties and functions." N.M. Stat. Ann. § 41-9-5 (1978).

The ROIA defines a "review organization," as follows:

> an organization whose membership is limited to health care providers and staff, except where otherwise provided for by state or federal law, and which is established by a health care provider which is a hospital, by one or more state or local associations of health care providers, by a nonprofit health care plan, by a health maintenance organization, by an emergency medical services system or provider as defined in the Emergency Medical Services Act, or by a professional standards review organization established pursuant to 42 U.S.C., Section 1320c-1 et seq. to gather and review information relating to the care and treatment of patients for the purposes of:
>
> (1) evaluating and improving the quality of health care services rendered in the area or by a health care provider;
> (2) reducing morbidity or mortality;
> (3) obtaining and disseminating statistics and information relative to the treatment and prevention of diseases, illnesses and injuries;
> (4) developing and publishing guidelines showing the norms of health care services in the area or by health care providers;
> (5) developing and publishing guidelines designed to keep within reasonable bounds the cost of health care services;
> (6) reviewing the nature, quality or cost of health care services provided to enrollees of health maintenance organizations and nonprofit health care plans;
> (7) acting as a professional standards review organization pursuant to 42 U.S.C., Section 1320c-1, et seq.; or

[2] Presumably, "CMS" is the Centers for Medicare and Medicaid Services, which "regulates the provision of health care" and for which the Joint Commission "fulfills an accrediting function." *Russo v. Brattleboro Retreat*, No. 15cv55, 2016 WL 299020, at *2 (D. Vt. Jan 25, 2016) (unpublished).

> (8) determining whether a health care provider shall be granted authority to provide health care services using the health care provider's facilities or whether a health care provider's privileges should be limited, suspended or revoked.

N.M. Stat. Ann. § 41-9-2 (1978).

The Joint Commission is an accrediting and certifying body which provides guidelines and standards for policies and practices and voluntary accreditation for hospitals. *See DeCecco v. UPMC*, 3 F. Supp. 3d 337 (W.D. Penn. 2014); https://www.jointcommission.org/about_us/about_the_joint_commission_main (last visited October 14, 2016). While the Commission does not fit squarely within the plain language of ROIA's definition of "review organizations," other courts have, at times, considered whether third-party entities nevertheless serve the same purposes outlined in the applicable peer-review statute such that the statute would apply. *See Russo v. Brattleboro Retreat*, No. 15cv55, 2016 WL 299020, at *2 (D. Vt. Jan 25, 2016) (unpublished) (reasoning that although a literal reading of Vermont's peer review statute does not suggest that the Joint Commission qualifies as a "peer review committee," the work of the Commission is "clearly peer review in nature"); *KD ex rel Dieffenbach v. United States*, 715 F. Supp. 2d 587, 596 (D. Del. 2010) (reasoning that whether or not the National Institute of Health review bodies meet the technical requirements of PSOs, they "clearly perform the same functions as Congress intended the PSQIA to encourage").

But here Plaintiff maintains that the Joint Commission is not a "review organization" as defined by ROIA, and a contrary position has not been advanced by Defendant Hospital. Nor has the Court unearthed, in its own research, any authority extending New Mexico's ROIA protections to documents created for or submitted to the

Joint Commission or a similar third-party organization. As such, the Court finds that Defendant Hospital has failed to meet its burden to establish that the Core Measures Stroke Data Compilations were generated exclusively for peer review and for no other purpose. Plaintiff's motion is granted to the extent that Defendant Hospital must produce documents Bates-labeled 000153-000156.

Unlike the Core Measures Stroke Data Compilation, it is not readily apparent that the Stroke Data Spreadsheets and Compilations were generated for submission to a third-party organization such as the Joint Commission. Yet, Plaintiff submits that Defendant Hospital's own description of the documents establishes that "they contain underlying data related to patient care in the hospital's stroke program" which she contends is not subject to ROIA merely because it was presented to a peer-review committee. Plaintiff also maintains that Ms. Dawson's affidavit fails to address whether the underlying data is "otherwise available from original sources."

In the Court's assessment, Plaintiff misconstrues ROIA's treatment of "underlying data" as well as its "otherwise available from original sources"[3] language. ROIA provides that "[i]nformation, documents or records otherwise available from original sources" is not immune from discovery "*merely because they were presented during proceedings of a review organization.*" N.M.S.A. § 41-9-5(A). This is not to say, however, that a statistical compilation generated for a review organization for peer-review purposes somehow becomes discoverable because it contains data related to

[3] The Court acknowledges that Counsel for Defendant Hospital agreed with counsel for Plaintiff, both in his briefing and in his argument at the motions hearing, that Defendant Hospital must demonstrate that the information at issue was not "otherwise available," as an element of its exclusivity burden. At the same time, Defendant Hospital's counsel insisted that the affidavit of Ms. Dawson, which did not independently address whether the withheld documents were "otherwise available," satisfied Defendant Hospital's exclusivity burden. Ultimately, the Court takes a different view of the requirements under *Smith*.

patient care that could re-compile from medical records. In the Court's view, the statute contemplates, instead, that information contained in peer-review documents that was not generated for peer review is not insulated from production when it may be produced through other means, for example through alternative discovery methods.

Not being persuaded by Plaintiff's exclusivity argument, the Court is left with its own *in camera* review of the documents together with Ms. Dawson's assurance that stroke data spreadsheets were in fact "generated exclusively to carry out one or more of the purposes of the peer review committees and/or review organizations and for no other purpose." *See Doc. 193*, Ex. C, at ¶ 9. On *in camera* review, the Court finds the documents to be consistent with documents and statistics it would expect to be generated for peer-review purposes. Accordingly, it concludes that Defendant Hospital has met its exclusivity burden. The inquiry does not end there, however, because Plaintiff submits that both the Stroke Data Spreadsheet 2012 and the Stroke Data Compilation 2012 are critical to her case. *Doc. 204 at 7.*

To be critical, it must be said that Plaintiff's case would likely to turn on evidence contained within the subject documents. *Chavez*, 189 P.3d 711 at 716 (quoting *Smith*, 755 P.2d at 44-45). The Court considers a number of factors in this regard, including whether the information contained in the document is more probative than any other evidence that Plaintiff can procure through reasonable means, whether the subject of the document goes directly to the issues in the case, whether the document was created close in time to the alleged negligence, whether other sources of discovery are likely to provide the same level of detail, and whether the document strongly implicates the interests motivating ROIA – that is, an attempt to understand why mistakes occur in

medical procedures. *See Schultz v. Byrne*, 08cv1182 WJ/GBW (D.N.M. September 29, 2009).

First, the Court finds that the documents involve peer review of statistical information aimed at understanding why medical errors in the treatment of stroke patients may have occurred. Thus, the documents strongly implicate ROIA interests, which weigh in favor of protecting them from the discovery process. On the other hand, some information contained in the documents also bear directly on issues in this case. Plaintiff contends that Defendant Hospital's systemic failures in the implementation of its stroke program and in hospital staffing and training were the cause of Gloria Quimbey's death. Where Defendant Hospital takes the position that the stroke program policies and implementation was adequate, statistical information regarding Defendant Hospital's implementation of its stroke program may be critical to Plaintiff's attempts to counter that position. Likewise, these documents are probative of Defendant Hospital's notice of deficiencies in its stroke program, perhaps more so than any other evidence that Plaintiff can procure through reasonable means.

In consideration of temporal proximity, the Court notes that the Stroke Data Compilation was presented in early 2013, just over a month after the December 11, 2012 subject incident. The Stroke Data Spreadsheet 2012 consists of statistical information for ten stroke patients treated at Defendant Hospital's facility in November and December 2012, also extremely close in time to the subject incident. Other sources of discovery are unlikely to provide the same level of detail as those provided by the Stroke Data Compilation and the Stroke Data Spreadsheet 2012. For instance, while the Core Measure Stroke Data Compilations provide some of the same information

provided in the Stroke Data Compilation and Stroke Data Spreadsheet 2012, the former provides far less detail than the latter.

On balance, the Court finds that the Stroke Data Compilation and Stroke Data Spreadsheet 2012 *are* critical to Plaintiff's case. As such, the Court will grant Plaintiff's motion with respect to documents Bates-labeled 000137-000142 and 000143-000152, subject to the redaction of any information identifying the name or phone number of patients.

The Core Stroke Data Spreadsheet, in contrast to the Stroke Data Compilation and the Stroke Data Spreadsheet 2012, appears to contain narrower, less probative information. More particularly, the statistical information provided in this spreadsheet is limited to the turnaround time for CT imaging on stroke patients. As the Court understands the assertions in this case, Plaintiff does not contend that a lengthy turn-around-time in obtaining a CT scan contributed to Ms. Quimbey's death. Further, the document also lacks temporal proximity, as the dates apparent on the document suggest that patients were treated by Defendant Hospital in March 2010, nearly three years before the subject incident. For all of these reasons, the Court does not find the Core Stroke Data Spreadsheet to be critical to Plaintiff's case, and it will deny Plaintiff's motion with respect to documents Bates-labeled 000157-000160.

**E. Stroke Program Satisfaction Data Compilation**

This document, provided to the Court on a compact disc, includes the names of stroke patients as well as certain ratings and comments elicited concerning their care at Defendant Hospital's facility. As with the other *in camera* documents, Ms. Dawson states in her affidavit that the Stroke Program Satisfaction Data Compilation was

"generated exclusively to carry out one or more of the purposes of the peer review committees and/or review organizations and for no other reason." *See Doc. 193* at ¶ 11. This compilation document, a record from a telephonic survey conducted by someone affiliated with Defendant Hospital in late August 2012, was conducted close in time to the subject incident. Plaintiff argues that this compilation "appears critical to Plaintiff's case, as it purports to contain patient feedback about the very program that Gloria Quimbey was a part of during her hospitalization at MVRMC – the stroke program." *Doc. 169* at 8.

In terms of probative value, the Court finds this document less probative of systemic deficiencies in Defendant Hospital's stroke program than other evidence produced pursuant to this Order. Additionally, its probative value is undercut by the subjective nature of the content provided therein. Likewise, the information it provides is less detailed than the stroke patient information provided in the Stroke Data Compilation and the Stroke Data Spreadsheet 2012. Having balanced the need to ensure the confidentiality of peer review against the needs of Plaintiff to discovery evidence essential to the merits of her case, the Court determines that Stroke Program Satisfaction Data Compilation is not critical to Plaintiff's case and need not be produced. Thus, the Court will deny Plaintiff's motion with respect to the information contained on the compact disc Bates-labeled 000163.

Wherefore,

**IT IS HEREBY ORDERED AS FOLLOWS:**

1. Plaintiff's Motion to Compel Discovery from Defendant Las Cruces Medical Center, LLC D/B/A Mountain View Regional Medical Center (*Doc. 169*) **is granted in part as follows:**
    a. Defendant Hospital must produce the internal surveys, as limited by Plaintiff's counsel;
    b. Defendant Hospital must produce the single document setting forth the Hospital's bonus incentive program, subject to an agreed-upon confidentiality order;
    c. Defendant Hospital must produce the Core Measures Stroke Data Compilations Bates-labeled 000153-000156;
    d. Defendant Hospital must produce the Stroke Data Compilation and Stroke Data Spreadsheet 2012 Bates-labeled 000137-000142 and 000143-000152, subject to the redaction of patient names and phone numbers.
2. Conversely, Defendant Mountain View Regional Medical Center's Motion for Protective Order (*Doc. 193*) **is granted in part as follows**:
    a. Defendant Hospital need not produce the Medical Variance Log Bates-labeled 000001-000034;
    b. Defendant Hospital need not produce the Incident/Accident Reports Bates-labeled 000035-000042 and 000161-000162;

c. Defendant Hospital need not produce the minutes and agendas Bates-labeled 000043-000136 and 000164-000173;

d. Defendant Hospital need not produce the Core Stroke Data Spreadsheet Bates-labeled 000157-000160;

e. Defendant Hospital need not produce the Stroke Program Satisfaction Data Compilation Bates-labeled 000163.

3. In all other respects, the above Motions are **denied**.

UNITED STATES CHIEF MAGISTRATE JUDGE