IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOHN FAURE, as Personal Representative
for the Wrongful Death Estate of
GLORIA QUIMBEY, Deceased.

            Plaintiff,

v.                                             No. 14cv559 KG/KBM

COMMUNITY HEALTH SYSTEMS
PROFESSIONAL SERVICES CORPORATION,
LAS CRUCES MEDICAL CENTER, LLC,
doing business as Mountain View Regional Medical
Center, ACCOUNTABLE HEALTHCARE
STAFFING, INC., ACCOUNTABLE HEALTHCARE
HOLDINGS CORPORATION, MEDASSETS
WORKFORCE SOLUTIONS, RONALD LALONDE,
AFFILION, LLC, and JOEL MICHAEL JONES, Dr.,

            Defendants,

and

LAS CRUCES MEDICAL CENTER, LLC ,

            Cross Claimant,

v.

ACCOUNTABLE HEALTHCARE
HOLDINGS CORPORATION,
ACCOUNTABLE HEALTHCARE
STAFFING, INC, and MEDASSETS
WORKFORCE SOLUTIONS,

            Cross Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court upon Defendant Dr. Joel Michael Jones and Affilion,

LLC's (together, "Affilion Defendants") Motion for Summary Judgment on All Claims ("Motion

for Summary Judgment"), filed April 29, 2016. (Doc. 134). Plaintiff John Faure ("Plaintiff"), as personal representative for the estate of Gloria Quimbey ("Ms. Quimbey"), filed a response on May 27, 2016, and a surresponse on September 27, 2016, while Affilion Defendants filed a reply on June 24, 2016, and a surreply on October 11, 2016. (Docs. 150, 174, 235, 236).

Additionally before the Court is Affilion Defendants' Motion to Strike New or Undisclosed Expert Opinions Contained in the "Updated" Report of Plaintiff's Expert, Dr. John C. Stein, Jr. ("Motion to Strike"), filed on October 11, 2016. (Doc. 238). Plaintiff filed a response on October 25, 2016, and Affilion Defendants filed a reply on November 8, 2016. (Docs. 243, 258). Having reviewed the motions, the accompanying briefs, and relevant law, the Court GRANTS both Affilion Defendants' Motion for Summary Judgment and Motion to Strike.

*I. Background*

This is a wrongful death lawsuit concerning the death of Gloria Quimbey. Plaintiff originally filed his Complaint for Wrongful Death, Negligence, Misrepresentation, and Punitive Damages ("Complaint") on May 9, 2014, in the First Judicial District Court of the State of New Mexico. (Doc. 1-1). Defendant Las Cruces Medical Center, LLC, d/b/a Mountain View Regional Medical Center ("MVRMC"), removed the case to this Court on June 17, 2014. (Doc. 1).

The Complaint alleges six counts. Count I is a wrongful death claim against all defendants under the New Mexico Wrongful Death Act, NMSA 1978, § 41-2-1 (Rep. Pamp. 1996). (Doc. 1-1) at 14. Count II is a negligence claim against Community Health Systems Professional Services Corporation and MVRMC Defendants (together, "CHS Defendants"). *Id.* at 14-20. Count III is a negligence claim against Accountable Healthcare Staffing, Inc., Accountable Healthcare Holdings Corporation, MedAssets Workforce Solutions, and Ronald

Lalonde ("AHS Defendants"). *Id*. at 20-22. Count IV is a negligence claim against Affilion

Defendants. *Id*. at 22-24. Count V is a claim for negligent or intentional misrepresentation

against CHS Defendants. *Id*. at 24-26. Finally, Count VI is a claim for punitive damages against

all defendants. *Id*. at 26. Affilion Defendants now move to strike Plaintiff's expert report

because it is untimely and contains new opinions and for summary judgment on all claims

against Affilion Defendants.

*II. Standard of Review*

    *A.  Standard of Review for Motion to Strike Expert Report*

        Federal Rule of Civil Procedure 26(a)(2) requires a party to disclose the identity of expert

witnesses. Expert witnesses must provide a report that contains, among other requirements, "(i)

a complete statement of all opinions the witness will express and the basis and reason for them;

[and] (ii) the facts or data considered by the witness in forming them." FED. R. CIV. P.

26(a)(2)(B)(i)-(ii). Pursuant to Rule 26(a), a party may supplement expert reports, if the party

discovers that a disclosure is "incomplete or incorrect" in a "material respect." *Id*. at

26(e)(1)(A).

    *B.  Standard of Review for Motion for Summary Judgment*

        Summary judgment is appropriate if the moving party shows "there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

56(a). Once the moving party meets its initial burden of demonstrating the absence of a genuine

issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing

that there is a genuine issue for trial. *See Schneider v. City of Grand Junction Police Dep't*, 717

F.3d 760, 767 (10th Cir. 2013). A dispute over a material fact is "genuine" only if "the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

*III. Facts and Reasonable Inferences Viewed in the Light Most Favorable to Plaintiff[1]*

    *A. Ms. Quimbey's Hospital Care*

Ms. Quimbey was admitted to the MVRMC emergency room ("ER") in the afternoon of December 11, 2012, after experiencing stroke like symptoms at home. (Doc. 24-1) at 11, ¶ 40. Defendant Dr. Joel Michael Jones ("Dr. Jones") acted as Ms. Quimbey's attending emergency physician while she was in the ER. (Doc. 150-1) at 33:8-9. Dr. Jones performed an initial neurological examination to determine if Ms. Quimbey should receive tPA, which is a medication given to potential stroke victims in order to break up blood clots. *Id.* at 37:15-20, 38:9-24. At the time of his initial examination, Dr. Jones planned to give Ms. Quimbey tPA. *Id.* at 37:20-23.

The MVRMC stroke policy in effect at the time stated that when a "Code Stroke" was called, the pharmacy would prepare the tPA.[2] (Doc. 150-10). Although once a "Code Stroke" was initiated, tPA was prepared by the pharmacy and taken to the ER, it would not be given to a patient without a doctor's order. (Doc. 150-3) at 13-18; (Doc. 150-8) at 91:11-17, 102:23-103:4. Here, a "Code Stroke" was called for Ms. Quimbey and the pharmacy prepared the tPA per

---

[1] Unless otherwise noted, the summary of material facts is undisputed.

[2] Affilion Defendants deny this fact and state that it is not material, but do not offer any evidence pursuant to FED. R. CIV. P. 56(c) to support a factual dispute. Further, the Court finds MVRMC's policy in regard to ordering tPA material to this case.

protocol.[3]  (Doc. 134-2) at 104:2-10; (Doc. 134-7) at 144:18-23; (Doc. 174-1) at 148:21-149:1, 150:11-25.

Once the "Code Stroke" was initiated, Rachel Bartlett ("Ms. Bartlett"), a MVRMC pharmacist, stated that she spoke to Dr. Jones on the phone and he told her "that the patient's condition seemed to be improving but (since we had already mixed the [tPA])[,] we could bring it down to the [ER] for him to have if he needed it."[4]  (Doc. 235-1); (Doc. 235-2) at 74:19-75:18. Nonetheless, Ms. Bartlett also testified that, per hospital policy, the tPA would have been delivered to the ER even without Dr. Jones asking for it to be delivered.  (Doc. 236-2) at 122:15-21.  The  tPA was delivered to the ER from the pharmacy; however, it is not clear who in the ER received the tPA.[5]  (Doc. 150-3) at 310:23-311:5, 311:11-14, 312:1-5.

---

[3] In Plaintiff's original reply to the Motion for Summary Judgment, Plaintiff argued that there was a dispute as to whether Dr. Jones issued a verbal order for tPA.  (Doc. 150) at 6-8. However, in the surresponse, Plaintiff states that Dr. Jones "initiated the 'Code Stroke.'  The pharmacy then prepared and delivered the tPA at his direction."  (Doc. 243) at 2-3.  Plaintiff has thus abandoned the argument that Dr. Jones issued a verbal order for the preparation of the tPA.

[4] Affilion Defendants deny this fact, because Dr. Jones testified that he could not remember speaking to the pharmacy.  (Doc. 236) at 2-3.  Considering the evidence in a light most favorable to Plaintiff, the Court will accept that Dr. Jones told Ms. Bartlett she could deliver the tPA to the ER.

[5] Plaintiff alleges that Dr. Jones received the tPA because Ms. Bartlett gave a written statement that a different pharmacist at MVRMC, "Brenda Padilla ["Ms. Padilla"][,] hand delivered the [tPA] to the physician in the emergency room."  (Doc. 235-1).  Even considering the facts as described by Plaintiff does not lead to a reasonable inference that Ms. Padilla gave the tPA to Dr. Jones, because the parties do not have Ms. Padilla's testimony and Ms. Padilla did not tell Ms. Bartlett the name of "the physician" to whom she gave the tPA.  Further, Ms. Bartlett admits that she does not know who Mr. Padilla delivered the tPA to in the ER.  (Doc. 236-2) at 124:24-125:2.

Plaintiff also points to the testimony of Melinda Day, the ER manager, for proof that Dr. Jones received the tPA from Ms. Padilla.  Ms. Day stated that she spoke to Dr. Jones in the doctors' area of the ER and "saw a bag.  I don't know what was in it."  (Doc. 235-3) at 64:6-11.  Ms. Day assumed the bag was the tPA; however, Dr. Jones did not reference the bag of medication while speaking with Ms. Day and she did not see any writing on the bag or notice a label.  (Doc. 235-3) at 65:2-3; (Doc. 236-3) at 66:3-5, 99:3-10.  Additionally, the area in which she saw the bag was

Ms. Quimbey underwent a CT scan in the ER, which showed that she had not experienced a stroke and her stroke symptoms resolved within two hours after her arrival in the ER. (Doc. 24-1) at 12, ¶ 42. Dr. Jones examined Ms. Quimbey after her CT scan, found that her condition had improved, and determined that "marked improvement is one of the contraindications to giving tPA." (Doc. 150-1) at 38:3-8. Dr. Jones did not administer tPA to Ms. Quimbey.

After several hours in the ER, Ms. Quimbey was admitted to the telemetry unit for observation at 3:30 p.m. on December 11, 2012. (Doc. 134-2). The telemetry unit did not use the same electronic system as the ER, so all orders for medications from the ER were supposed to be automatically deleted once an individual transfers to a different unit of the hospital. (Doc. 134-7) at 71:20-21, 74:8-75:19, 109:13-20. However, in this case tPA was sent up to the telemetry unit when Ms. Quimbey was admitted. (Doc. 150-3) at 312:1-3; (Doc. 150-8) at 190:6-10. In the telemetry unit, an order for tPA was listed on Ms. Quimbey's Medication Administration Record ("MAR"), which is used in the Telemetry unit but not the ER. (Doc. 134-3) at 87:19-88:6; (Doc. 134-3) 76:11-77:1; (Doc. 150-7). It is the admitting physicians' job to ensure that a patient in the telemetry unit has the correct medication. (Doc. 134-7) at 75:7-11. Dr. Luis Rivera-Crespo is listed as the admitting physician on the MAR. *Id*.

open to ER personnel and did not contain assigned desks for the physicians. (Doc. 236-3) at 99:24-100:12. Ms. Day also stated that she "heard" that "the night doctor came on, saw the [tPA]" in the doctor's area, "handed it to the nurse who sent it upstairs through the tube system." *Id*. at 86:9-13. Ms. Day admits that she does not have personal knowledge of this information, but heard the story "just over the course of the investigation when we . . . talked about how things could have happened." *Id*. at 86:22-24. Because Ms. Day states that she heard this story when individuals were speculating about the events, the Court will not consider the information. Therefore, even considering the facts in a light most favorable to Plaintiff does not lead to the reasonable inference that Dr. Jones received the tPA in the ER.

At 11:30 p.m. on December 11, 2012, a telemetry nurse, Ronald LaLonde ("Nurse LaLonde") administered tPA to Ms. Quimbey. (Doc. 134-2), (Doc. 134-9), (Doc. 134-10) at 93:9-12. Nurse LaLonde gave Ms. Quimbey the medication without looking for a doctor's order, although it was hospital protocol to do so, and without consulting with a doctor or a charge nurse. (Doc. 134-10) at 101:8-10, 143:24-144:2, 231:8-232:9. Nurse LaLonde testified that he knew tPA was only supposed to be given in the ER within three hours of the onset of stroke symptoms. *Id.* at 73:1-9, 96:9-12, 143:3-9, 214: 18-22. After Ms. Quimbey was given the tPA she fell into a coma and eventually died. (Doc. 24-1) at 13, ¶ 48. The Autopsy Report states that Ms. Quimbey "died of intracerebral hemorrhage due to inadvertent administration of anticoagulant therapy [tPA]." (Doc. 150-13).

### B. Dr. John C. Stein, Jr's Expert Report

Plaintiff's expert disclosure deadline was March 17, 2016, and subsequently extended to March 24, 2016, at which time Plaintiff timely served Dr. John C. Stein, Jr.'s ("Dr. Stein") original expert report. (Docs. 85, 117, 125). Expert disclosures for all Defendants were due on April 25, 2016. (Doc. 117). On September 27, 2016, Plaintiff served an updated expert report written by Dr. Stein. (Doc. 238-3). Plaintiff intends to introduce the testimony of Dr. Stein to discuss tPA protocol. (*See* Docs. 238-1,238-3).

In his original expert report, Dr. Stein first summarizes the materials he reviewed, including Mr. Quimbey's medical records and MVRMC's stroke and emergency department policies and protocol. (Doc. 238-1) at 1. Dr. Stein next lays out a chronology of events from the time Ms. Quimbey entered the ER on December 11, 2012, to her death on December 12, 2012. *Id.* at 1-2. Dr. Stein discusses the administration of tPA in general and the use of tPA in this case. *Id.* at 2-3. Finally, Dr. Stein states his conclusions. *Id.* at 3. With regard to Dr. Jones, Dr.

Stein opined that "the hospital stroke protocol for the initiation of tPA and the initial physician order for the preparation of the tPA were appropriate."[6]  *Id.*  However, Dr. Stein concluded in his original expert report that "[t]he order for TPA that was initiated in the emergency department was never cancelled, which is below the standard of care."  *Id.*

In drafting his updated expert report, Dr. Stein reviewed thirteen depositions and the briefing for Affilion Defendants' Motion for Summary Judgment.  (Doc. 238-3) at 1.  Dr. Stein again described the chronology of events and administration of tPA.  *Id.* at 3-6.  Whereas in the original expert report, Dr. Stein determined that Dr. Jones ordered the tPA; in the updated report, Dr. Stein states "the hospital stroke protocol for the initiation of a code stroke, including the tPA preparation was appropriate."  *Id.* at 3.  Further, Dr. Stein noted that "[a]fter Dr. Jones determined the patient was no longer a candidate for tPA therapy, the onus was on him to assure that the protocol for its administration was clearly terminated."  *Id.*  Dr. Stein concluded that "[t]he order for TPA that was initiated in the emergency department was never cancelled definitively, ultimately a responsibility of the treating physician, which is below the standard of care."  *Id.* at 4.

*IV. Discussion*

   *A.  Motion to Strike*

Affilion Defendants now move the Court to strike Dr. Stein's updated expert report in its entirety.  Affilion Defendants contend that the report should be excluded because the report was untimely and introduces new opinions.

As an initial matter, Plaintiff contends that a motion to strike is "not the proper mechanism to exclude expert testimony."  (Doc. 243) at 1, n. 1.  Plaintiff cites *Peshlakai v. Ruiz*,

---

[6] The Court assumes Dr. Stein is referring to Dr. Jones as "the initial physician," as Dr. Jones was Ms. Quimbey's physician in the ER.

in which the Court held that Rule 12(f) did not permit the Court to strike a non-retained witness, because Rule 12(f) only permits the Court to strike materials in pleadings. No. CIV 13-0752 JB/ACT, 2013 WL 6503629, *1, *21 (D.N.M.) (unpublished). Affilion Defendants did not bring the Motion pursuant to Rule 12(f), but instead pursuant to Rule 26(a)(2). Although typically styled as a Motion to Exclude Expert Testimony, the Motion to Strike is appropriate.

### 1. Dr. Stein's Opinions in the Updated Expert Report

Supplementation of an expert report is required under the Federal Rules of Civil Procedure in certain circumstances. Specifically, supplementation is required when a "party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." FED. R. CIV. P. 26(e)(1)(A). With regard to the testimony of expert witnesses, this "duty to supplement extends both to information included in the report and to information given during the expert's deposition." *Id*. at 26(e)(2). Although the Rule requires supplementation,

> that provision does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report. To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could 'supplement' existing reports and modify opinions previously given. This practice would surely circumvent the full disclosure requirement implicit in Rule 26 and would interfere with the Court's ability to set case management deadlines, because new reports and opinions would warrant further consultation with one's own expert and virtually require new rounds of depositions.

*Beller ex rel. Beller v. United States*, 221 F.R.D. 689, 695 (D.N.M. 2003) (quoting *Resolution Trust Corp. v. Gregory*, No. CIV 94-0052 (D.N.M. 1995) (unpublished)).

Here, Plaintiff argues that after the preparation of the original expert report, new information was discovered through deposition testimony, which required the supplementation

of the original report because it was no longer correct. (Doc. 243) at 2. Specifically, Plaintiff argues that Dr. Jones' role in ordering the tPA was not clear until deposition testimony taken after the original expert report was completed. *Id*. at 2-3. Plaintiff contends that "Dr. Stein supplemented his report to more accurately recognize the sequence of events, including that the tPA was never 'definitively' cancelled." *Id*. at 6.

Originally, Dr. Stein found that "the hospital stroke protocol for the initiation of tPA and the initial physician order for the preparation of the tPA were appropriate."[7] (Doc. 238-1) at 2. Further, Dr. Stein states that "[i]n light of the findings on the CT scan and the improvement of Mrs. Quimbey's symptoms within an hour, it was appropriate to cancel the tPA order." *Id*. Dr. Stein concluded that "[t]he order of TPA that was initiated in the emergency department was never cancelled, which is below the standard of care." *Id*. Although in the section regarding the administration of tPA Dr. Stein states that Dr. Jones ordered the tPA, Dr. Stein does not specifically state that it was Dr. Jones' responsibility to cancel the tPA in his conclusion. Instead, Dr. Stein more generally states that the tPA was never cancelled and does not opine by whom.

Subsequently, in the updated expert report, Dr. Stein states that "the hospital stroke protocol for the initiation of a code stroke, including tPA preparation was appropriate." Dr. Stein contends that

> [i]n light of the findings on the CT scan and the improvement of Mrs. Quimbey's symptoms within an hour, the code stroke (including the tPA order) could have been cancelled appropriately. Instead, the tPA was delivered to the [ER] at the request of the [ER] physician, and was never returned to the Pharmacy. After Dr. Jones determined the patient was no longer a candidate for tPA therapy, the onus was on him to assure that the protocol for its administration was clearly terminated.

---

[7] The Court assumes that the reference to "the initial physician" refers to Dr. Jones because he was Ms. Quimbey's ER physician.

(Doc. 238-3) at 3.  In his conclusions, Dr. Stein states that "[t]he order for TPA that was initiated in the ER was never cancelled definitively, ultimately a responsibility of the treating physician, which is below the standard of care."  *Id*. at 4.  As compared to the original expert report, in the updated expert report Dr. Stein clearly holds Dr. Jones responsible for not cancelling the order for tPA.  In sum, Dr. Stein's original expert report finds fault generally with the ER that the tPA was not cancelled; while the updated report places responsibility on Dr. Jones for not cancelling the tPA.  *Compare* (Doc. 238-1) at 4, *with* (Doc. 238-3) at 4.

Both Plaintiff and Dr. Stein acknowledge that after taking deposition testimony it was clear that Dr. Jones never ordered the tPA, rather it was prepared by the pharmacy after a "Code Stroke" was initiated.  (Doc. 238-3) at 3; (Doc. 243) at 2-3.  Plaintiff contends that Dr. Stein was required to update his expert report because "Plaintiff [ ] obtained evidence about the precise process through which the tPA was initiated and delivered to the emergency room in this case," through deposition testimony.  (Doc. 243) at 3.  However, the determination of how the tPA was ordered and delivered is not at the crux of Dr. Stein's conclusion, and the determination of who was responsible for cancelling the tPA should not have changed based on the new evidence.

Instead, it appears that Dr. Stein's updated report was produced as a rebuttal to Affilion Defendants' expert report written by Dr. R. Lynne Rea ("Dr. Rea").  Similar to Dr. Stein, Dr. Rea determined that it was appropriate not to administer the tPA to Ms. Quimbey.  (Doc. 243-7) at 4.  However, Dr. Rea concluded that because "there was never an order by a physician to administer tPA, . . . it was not necessary for there to be an order to cancel the administration of tPA."  *Id*.  Further, Dr. Rea states that "Emergency Physicians such as Dr. Joel Jones do not have responsibility for the handling or administration of medications either in the [ER] or on the floors so he would have no responsibility for the handling of medication once it left the pharmacy."  *Id*.

Dr. Stein's updated expert report is not a proper supplementation, because there was no error in his original report and he did not correct misinformation in his conclusion. Instead, Dr. Stein offers "an entirely new and previously undisclosed basis for the opinion. This is contrary to requirements of Rule 26 in that" his original expert report "did not contain a complete statement of all the opinions to be expressed and the basis and reasons." *Coleman v. BNSF Ry. Co.*, No. 1:06CV01076, 2008 WL 5622542, at *4 (D.N.M.) (unpublished). The updated expert report is a rebuttal; therefore, the Court will determine whether it was filed timely.

### 2. *Timeliness of Updated Expert Report*

The timeliness for updates to expert reports depends on the purpose of the updates. Expert reports "intended solely to contradict or rebut evidence on the same subject matter identified by another party" must be disclosed "within 30 days after the other party's disclosure." FED. R. CIV. P. 26(a)(2)(D)(ii). Any supplement to an expert report, including additions or changes to information, "must be disclosed by the time the party's pretrial disclosures . . . are due." *Id.* at 26(e)(2). The Court determined that Dr. Stein's updated report is intended to rebut Dr. Rea's expert report; therefore, Plaintiff had thirty days after the disclosure of Dr. Rea's report to update Dr. Stein's report. Plaintiff did not meet this deadline; therefore, the updated expert report was untimely.

### 3. *Violation of Rule 26(a)(2)*

The Court must address a violation of Rule 26(a)(2) pursuant to Rule 37(c), which states: if a party fails to provide information pursuant to Rule 26(a), "the party is not allowed to use that information . . . to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). The Court has the broad discretion to determine if a violation is justified or harmless. *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170

F.3d 985, 993 (10th Cir. 1999). In the exercise of its discretion, "[a] district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose." *Id.* However, the Tenth Circuit has identified four factors to determine if a failure to disclose was substantially justified or harmless: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Id.* (citing *Newman v. GHS Osteopathic Inc.*, 60 F.3d 153, 156 (3d Cir. 1995)).

### a. Prejudice or Surprise to Defendant

Plaintiff argues that Affilion Defendants cannot claim prejudice or surprise because Dr. Rea's expert report includes the opinion that Dr. Jones' actions were justified, Dr. Rea had the opportunity to supplement his expert report, and Affilion Defendants could depose Dr. Stein regarding his updated expert report. (Doc. 243) at 9. Indeed, at the time the Motion to Strike was filed, the parties had not completed the depositions of Dr. Rea or Dr. Stein, so Affilion Defendants had the opportunity to question Dr. Stein regarding his updated expert report. *Id.* at 10. Further, Plaintiff argues that Dr. Stein did not present a new theory because the Complaint alleges that Dr. Jones "was negligent in his care and treatment of Mrs. Quimbey through acts or omissions, which include, . . . [f]ailure to ensure [the] tPA order was discontinued." (Doc. 24-1) at 23.

Affilion Defendants counter that they would be prejudiced if the Court does not exclude the updated report. Specifically, they argue they have litigated the case for two years with the understanding that Plaintiff was claiming that Dr. Jones placed an order for tPA and failed to cancel his order, not that he was responsible for cancelling an order that he did not make. (Doc.

258) at 10.  Affilion Defendants state that the parties have completed twenty fact witness depositions, thirteen expert reports and depositions, retained their own expert, and submitted five motions for summary judgment at this point.  *Id.* at 11.  At this point in the case, discovery has closed and the parties filed a consolidated Proposed Pretrial Order on May 18, 2017.  (Doc. 404).

"The type of prejudice that rises to the level of warranting the exclusion of a witness's testimony . . . is the inability of the opposing party to fully litigate the case and defend against the new testimony."  *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1255 (10th Cir. 2011).

Here, the updated expert report from Dr. Stein alleges a new theory in this case, that Dr. Jones' actions fell below the standard of care because he did not cancel the tPA.  Although Plaintiff alleged in the Complaint that Dr. Jones failed to cancel the tPA, nothing in Dr. Stein's original expert report put Affilion Defendants on notice that Dr. Jones fell below a physician's standard of care.  This is the exact harm that the Rules seek to eliminate.  Indeed, the purpose of filing "written reports in a timely fashion is the 'elimination of unfair surprise to the opposing party and the conservation of resources.'"  *Sage-Allison v. Novartis Pharm. Corp.*, Civ. No. 07-25 KG/ACT, 2013 WL 12157868, at *11 (unpublished) (citing FED. R. CIV. P. 26(a)(2); *Leviton Mfg. Co., Inc. v. Nicor, Inc.*, 245 F.R.D. 524, 531 (D.N.M. 2007)).

Further, based on the original expert report, filed March 24, 2016, Affilion Defendants filed their Motion for Summary Judgment on April 29, 2016.  On August 30, 2016, the Court granted the parties' Joint Motion for Leave to File Limited Surresponse and Surreply.  (Doc. 217).  Plaintiff filed the surresponse to the Motion for Summary Judgment and the updated expert report on the same day.  "Where a party proposes amendments while dispositive motions are pending, a court should not allow an amendment whose purpose is to prevent termination of the case on a motion to dismiss or on summary judgment."  *Sage-Allison*, 2013 WL 12157868, at

*12 (quoting *Leviton Mfg. Co., Inc.*, 245 F.R.D. at 530) (internal citations omitted). It appears Plaintiff filed Dr. Stein's updated expert report, at least in part, for the purpose of preventing Affilion Defendant's dismissal from the case. Accordingly, the Court finds that Defendant is prejudiced by the untimeliness of Dr. Stein's supplemental expert report. Thus, this factor weights in favor of finding the untimely disclosure is not substantially justified or harmless.

### b. Ability of Defendant to Cure the Prejudice

Plaintiff claims that Affilion Defendants can cure any prejudice by deposing Dr. Stein regarding his supplemental expert report and asking their own expert to supplement his report in light of Dr. Stein's supplemental expert report. (Doc. 243) at 11. Affilion Defendants contend that Plaintiff's failure to comply with the Court's deadlines cannot be cured simply by taking Dr. Stein's deposition. (Doc. 258) at 12.

After several extensions, discovery did not end in this case until January 13, 2017. (Doc. 253). Plaintiff is correct that Affilion Defendants had the opportunity to depose Dr. Stein; however, failure to comply with a scheduling order is not "excused simply because the expert was available for a deposition." *Beller*, 221 F.R.D. at 694 (citing *Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277 (8th Cir. 1995)). "[T]o rule otherwise would frustrate the purpose of the [ ] rule, which is the 'elimination of unfair surprise to the opposing party and the conservation of resources.'" *Id.* (quoting *Sawdon*, 47 F.3d at 284). The purpose of Rule 26(a) is to ensure finality for expert reports so that the Court may set appropriate case management deadlines and so that parties do not continue to supplement and modify opinions in an effort to circumvent the full disclosure requirement of Rule 26(a). *Id.* at 695. The Tenth Circuit states "[t]he orderly conduct of litigation demands that expert opinions reach closure." *Miller v. Pfizer*, 356 F.3d

1326, 1334 (10th Cir. 2004). Therefore, the second factor weighs in favor of finding the untimely report is not substantially justified or harmless.

### c. The Extent to Which the Opinion will Disrupt Trial

Trial has not been set in this case. However, discovery has closed and the parties filed their Proposed Pretrial Order on May 18, 2017. (Doc. 404). Based on the extensive motion practice required, the supplemental expert report has to some extent disrupted the Court's case management. The Court finds that the third factor tips in favor of finding the untimely report is not substantially justified or harmless.

### d. Plaintiff's Bad Faith or Willfulness

Affilion Defendants argue that the updated expert report was made in bad faith and in an attempt to "sandbag" them. (Doc. 258) at 12-13. Affilion Defendants maintain that they agreed to additional briefing on the Motion for Summary Judgment "in good faith because Plaintiff claimed they wanted to brief the additional deposition discovery on the claim that Dr. Jones placed an order for tPA." *Id.* at 13 (emphasis in original omitted).

While the Court agrees that Plaintiff delayed in filing the supplemental expert report, the Court does not find any direct evidence of Plaintiff's bad faith or willfulness. Accordingly the fourth factor weighs in favor of finding the report is substantially justified or harmless.

### e. Totality of Woodworker's Supply Factors

Analyzing the four *Woodworker's Supply* factors, the untimeliness of Plaintiff's expert report caused prejudice to Defendants due to Dr. Stein's previously undisclosed opinions. Because the rules were specifically enacted to prevent this type of prejudice and to set clear guidelines for the parties to follow, this prejudice cannot be cured simply by taking a deposition. Additionally, the untimeliness of the report disrupted the case management deadlines in this

case.  Considering the totality of the factors, the Court finds that the report is not substantially justified or harmless and grants Affilion Defendants' Motion to Strike.

### B.  Motion for Summary Judgment

Affilion Defendants also move for summary judgment on all of Plaintiff's claims against them.  Plaintiff claims that the Affilion Defendants were negligent in their care and treatment of Ms. Quimbey.  Specifically, Plaintiff states that Dr. Jones: (1) failed "to ensure [the] tPA order was discontinued:" (2) failed "to ensure that [the] tPA did not remain on the floor, even after orders for its administration had been discontinued;" (3) failed "to ensure that tPA was safeguarded as befits a high-alert medication;" and (4) failed "to ensure that hospital records reflected that the medication had been discontinued."  (Doc. 24-1) at 23, ¶ 88.  Affilion Defendants argue that Plaintiff's claims fail as a matter of law because Dr. Jones did not place an order for tPA or administer tPA to Ms. Quimbey.  (*See* Doc. 134).

To prevail on a negligence claim under New Mexico law, a plaintiff must show the existence of a duty, a breach of that duty, which is based upon a standard of reasonable care, and that the breach was the proximate cause of plaintiff's injuries.  *Herrera v. Quality Pontiac*, 2003-NMSC-018, ¶ 6, 134 N.M. 43.  The existence of a duty is a question of law for the court; whereas, proximate cause is generally a question of fact for a jury.  *Id*. at ¶¶ 7-8 (internal citations omitted).  In New Mexico "healthcare providers are 'under the duty to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified healthcare providers practicing under similar circumstances.'"  *Alberts v. Schultz*, 1999-NMSC-015, ¶ 19, 975 P.2d 1279 (quoting UJI 13-1101 NMRA) (duty of doctor)).

### 1. Type of Negligence Claim

Plaintiff argues that this action is not predicated on "medical negligence," but ordinary negligence. (Doc. 150) at 13, n. 1. The distinction is important, because expert testimony is needed "if [an] act involves the use of specialized knowledge or skill to make a judgment call as to the appropriate thing to do or not do." *Id*. at ¶ 22. Plaintiff states that because the tPA was "contraindicated," there is no "judgment call" for the Court to examine. (Doc. 150) at 13, n. 1. Instead, Plaintiff maintains this is an ordinary negligence case involving "institutional failures and communication breakdowns in the hospital." *Id*.

Plaintiff's argument is unavailing. Expert testimony is not necessary "if negligence can be determined by resort to common knowledge ordinarily possessed by an average person." *In re Otero*, 527 B.R. at 769 (quoting *Zamora v. St. Vincent Hosp.*, 2014-NMSC-035, ¶ 27) (internal quotation marks omitted)). In this case, Plaintiff claims that Dr. Jones failed to (1) cancel the tPA order, (2) ensure it did not remain in the ER, (3) safeguard the tPA; and (4) ensure hospital records reflected the tPA was cancelled. (Doc. 24-1) at 23, ¶ 88. A lay person would not know the proper procedure to order, cancel, and record medication at a hospital and could not determine whether Dr. Jones' actions with regard to the tPA fell below the standard of care of a physician. Therefore, expert testimony is necessary on the causation element of this negligence claim.

### 2. Breach of Duty

The parties do not dispute that Dr. Jones owed Ms. Quimbey a duty; therefore, the Court will first look to whether Dr. Jones breached this duty. Plaintiff claims that Dr. Jones was negligent because he did not send the tPA back to the pharmacy after he determined that tPA was unnecessary. For a physician to breach his duty, "he must have departed from the recognized

standards of medical practice . . . or must have neglected to do something required by those standards." *Alberts*, 1999-NMSC-015, ¶ 20 (quoting *Cervantes v. Forbis*, 1964-NMSC-022, ¶ 12).

To establish the standard of care for Dr. Jones' conduct, Plaintiff offers Dr. Stein's testimony. However, Dr. Stein's original expert report states generally that "[t]he order for TPA that was initiated in the emergency department was never cancelled, which is below the standard of care." (Doc. 238-1) at 3. Plaintiff acknowledges that the order for the tPA was not initiated in the ER, but rather in the pharmacy after a "Code Stroke" was called. (Doc. 243) at 2-3. Given that neither Dr. Jones nor any other staff member in the ER ordered the tPA, it is unclear from Dr. Stein's report who breached their duty to Ms. Quimbey by not cancelling the tPA. Dr. Stein's report does not connect a breach of a duty to Dr. Jones' actions.

Plaintiff has the burden to prove through expert testimony that Dr. Jones breached his duty to Ms. Quimbey. Because Dr. Stein's expert report does not allege that Dr. Jones fell below the standard of care for a physician, Plaintiff cannot prove a breach of duty and Plaintiff's negligence claim against Dr. Jones fails. As such, the Court will grant summary judgment on the negligence claim against Dr. Jones.

### 3. Defendant Affilion

In addition to the claims against Dr. Jones, Plaintiff brings claims for negligent hiring, training, retention, and supervision, as well as vicarious liability against his contractor, Defendant Affilion. (Doc. 24-1) at 22-23, ¶ 87. Affilion Defendants argue that if the Court

grants summary judgment on all claims against Dr. Jones, summary judgment should be granted against Affilion as his employer.  (Doc. 134) at 9.

The Court notes that Plaintiff did not respond to Affilion Defendants' request for summary judgment on the claims against Affilion.  Therefore, the Court deems all claims against Affilion abandoned and will dismiss the claims with prejudice.  *See Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1393 (10th Cir. 1992) (stating failure to rebut defendants' arguments for summary judgment is fatal to plaintiff's claim).

### C.  *Deferment of Motion for Summary Judgment*

In his response, Plaintiff requests the Court deny the Motion for Summary Judgment, or, in the alternative, defer consideration of the Motion of Summary Judgment pursuant to Rule 56(d) to finish discovery.  (Doc. 150).  The Court granted the parties' Joint Motion for Leave to File Limited Surresponses on August 30, 2016, in light of discovery completed after the filing of the Motion for Summary Judgment.  (Doc. 217).

Plaintiff did not renew his request to defer in his surresponse and discovery ended on January 17, 2017.  Therefore the Court considers Plaintiff's request to defer consideration of the Motion for Summary Judgment moot.

### V. *Conclusion*

In light of the foregoing, the Court grants the Motion for Summary Judgment and Motion to Strike.

IT IS ORDERED that

1.  Affilion Defendants' Motion to Strike (Doc. 238) is granted;

2.  Affilion Defendants' Motion for Summary Judgment (Doc. 134) is granted;

3. summary judgment will be entered in favor of Defendants Jones and Affilion, LLC on all of Plaintiff's claims ; and

4. those claims will be dismissed with prejudice.

IT IS FURTHER ORDERED that based on the dismissal of Affilion Defendants,

1. Defendant Jones' Motion for Summary Judgment on Plaintiff's Punitive Damages Claim (Doc. 247) shall be terminated;

2. Defendant Affilion, LLC's Motion for Summary Judgment on Plaintiff's Vicarious Punitive Damages Claim for the Conduct of Defendant Dr. Joel Jones (Doc. 248), Motion for Summary Judgment on Vicarious Liability Claims (Doc. 249), and Motion for Summary Judgment on All Direct Negligence Claims Against it (Doc. 250) shall be terminated; and

3. Defendants Jones and Affilion, LLC's *Daubert* Motion to Exclude, in part, the Expert Opinion Testimony of Dr. John C. Stein which are not Supported within the Record (Doc. 341) shall be terminated.

UNITED STATES DISTRICT JUDGE